IN THE MATTER OF LESTER T. VINCENTI, AN
ATTORNEY AT LAW.

Argued November 29, 1988—Decided March 10, 1989.

*John J. Janasie,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Nancy Iris Oxfeld* argued the cause for respondent (*Klausner, Hunter & Oxfeld,* attorneys; *Nancy Iris Oxfeld* and *Lester T. Vincenti, pro se,* on the briefs).

PER CURIAM.

This is an attorney-disciplinary case involving Lester T. Vincenti, whose professional conduct was the occasion of previous

public discipline. *In re Vincenti,* 92 *N.J.* 591 (1983). A formal complaint was filed with the District XII (Union County) Ethics Committee (DEC). The complaint alleged professional misconduct in connection with a civil proceeding entitled *Dauphin et al. v. Webb et al.,* No. L–37942–83 (Union County 1983). Following a hearing, the DEC returned a presentment to the Disciplinary Review Board (DRB) finding respondent guilty of unethical conduct and recommending discipline. While the matter was pending before the DRB, the Office of Attorney Ethics (OAE) filed with the DRB a motion for final discipline against respondent based on three separate incidents. Each of these matters included convictions of respondent for the petty disorderly-person's offense of using loud and abusive language, in violation of *N.J.S.A.* 2C:33–2(b). The Decision and Recommendation of the DRB dismissed the motion of the OAE for final discipline primarily on procedural grounds. With respect to the respondent's misconduct in the *Dauphin* matter, the DRB determined that respondent had violated the Rules of Professional Conduct and by a majority vote recommended a public reprimand as discipline.

I.

As previously indicated, the proceedings before the DRB included the motion of the OAE for final discipline based on respondent's earlier convictions of disorderly-persons offenses. These arose out of three separate incidents occurring in 1980. The DRB, however, declined to determine whether professional discipline for respondent's three disorderly-persons convictions should be imposed for several reasons. It noted that respondent's actions occurred during the same time that he engaged in conduct for which he was suspended from the practice of law for one year in 1983, as reported in *In re Vincenti, supra,* 92 *N.J.* 591. The DRB believed that the discipline then imposed probably encompassed these other incidents. It also determined that respondent's convictions were based on violations of *N.J.S.A.* 2C:33–2(b), which was subsequently declared unconsti-

tutional (*see State in Interest of H.D.*, 206 *N.J.Super.* 58, 61 (App.Div.1985)), and, consequently, these convictions could not serve as an independent basis for discipline. For these reasons, the DRB dismissed the motion of the OAE. This determination has not been appealed.

In the *Dauphin* matter, respondent was the attorney for plaintiffs who brought a civil personal injury action against New Jersey Transit and two of its employees. These defendants were represented by the Attorney General. A complaint against respondent alleging professional misconduct in the course of this proceeding was filed with the DEC by the Deputy Attorney General, who was respondent's adversary. Following a two-day hearing, the DEC determined that respondent, at the time of the trial call, threatened opposing counsel, engaged in vulgar name-calling, and failed to cooperate in appearing for the trial call. It determined further that during the course of the trial itself, respondent continued to engage in vulgar name-calling directed towards opposing counsel; respondent also engaged in name-calling of the defendants' investigator and challenged him to a fight; and in a telephone conversation, respondent used threatening, abusive, and vulgar language directed to the trial judge's law clerk. The DEC concluded respondent had engaged in "vulgar name-calling," which violated *RPC* 3.2. It also concluded that respondent engaged in conduct prejudicial to the administration of justice by failing to cooperate in appearing for the trial call, by failing to treat all persons involved in the legal process with courtesy, and by using abusive and vulgar language directed to the trial judge's law clerk. This misconduct violated *RPC* 8.4(d). The DEC recommended public discipline.

In its determination of this matter, the DRB narrates the ensuing presentation of testimony, which conforms to our own assessment of the record:

On February 25, 1985, the case was called for trial at 8:30 a.m., but respondent was not present. The DAG testified he had two witnesses present and was prepared to proceed that day, because the matter had been postponed

several times previously. He believed this date was a peremptory trial date. Respondent arrived approximately 45 minutes later. The DAG alleged respondent simply informed him he could not proceed at that time. When the DAG objected, respondent became agitated. The DAG asserted respondent began to use loud, abusive, obscene language. As the two walked through the courthouse rotunda towards the assignment clerk's office, the DAG alleged respondent challenged him to a fight. An NJT investigator, who was accompanying the DAG, stepped between the two and defused the situation. The parties proceeded toward the assignment clerk's office, while respondent engaged in a constant barrage of profanity. The matter was ultimately postponed for approximately two weeks.

Respondent testified there was no serious challenge to fight and that any "street language" he used could not possibly have offended the DAG. Moreover, respondent did not see any witnesses present at that time.

The DAG further claimed respondent harrassed him many times during the trial by using obscene and profane language and a "threatening tone" towards him. All of the harassment occurred during recesses in the trial, when the court, the witnesses and the jury were not present. According to the DAG, respondent once commented "I see you are turning black again,...." At other times respondent told the DAG he was incompetent. At another point respondent told the DAG "you are a piece of shit." At least twice, according to the DAG, respondent challenged him to fight. Respondent denies all of this.

During the course of the trial the parties attempted once again to settle. At one point the DAG met alone with the judge in chambers and agreed to make a maximum offer of $25,000. As respondent was preparing to enter the judge's chambers, the NJT investigator handed him copies of medical reports that had just been obtained and were intended for rebuttal. As respondent left chambers and passed counsel table, he commented that the offer was "an insult", that the defendants were not negotiating in good faith. He then threw the copies of the medical reports onto the table. The papers slid across the table and hit the NJT investigator on the hand. Respondent again categorically denied all of this.

The NJT investigator testified to an incident between respondent and himself that occurred in an elevator in the courthouse. The NJT investigator was waiting for the elevator. When the doors opened, respondent, the only passenger, walked out. On his way past the investigator, respondent made a noise that sounded like "ha." The investigator understood this to be a laugh and began to laugh himself as he entered the elevator. The investigator testified he then heard a loud noise. When he turned around, respondent was holding the doors open and demanding the investigator get off the elevator. When the investigator refused, respondent challenged "you shit" to fight. Respondent then queried as to whether the investigator was afraid of respondent. After calling him another name, respondent finally let the elevator doors close. Respondent denied this incident in its entirety.

A witness at the district ethics committee hearing testified on behalf of respondent and disputed all prior testimony. According to her, she accompanied respondent to the courthouse on the day of the trial call and on all days of

the trial, where she sat next to respondent at counsel table. She testified the DAG "in essence, called [respondent] a liar." She testified the DAG made several derogatory comments to respondent including several references to his prior suspension from the practice of law. "I thought we'd gotten rid of you by now," and, "are you still practicing?"

This witness also testified that at no time did respondent physically touch the DAG, although the DAG did grab respondent's arm in front of the court and the jury. This occurred during respondent's cross examination of a physician, who testified that her subpoena was in her pocketbook, which was in another part of the courtroom. Respondent retrieved the pocketbook and asked, "Is this yours?" At that point the DAG grabbed respondent's arm. The court directed the DAG to release the arm.

The DRB's reported decision describes yet another incident that involved the trial judge's law secretary:

Subsequent to the trial, respondent filed a motion for a new trial. After receiving the papers, the law clerk telephoned respondent. She apparently requested respondent provide a supporting affidavit or a brief. She testified that respondent made a comment like "get real," that the judge knew the reasons for the motion and that he had no intentions of filing a brief. The clerk testified respondent then informed her she did not know what she was doing and became abusive. She then advised respondent she would not continue to talk to him if he were not going to be civil. He responded: "I am not taking this fucking shit."

Respondent testified he never made the statements attributed to him. First of all, he testified he never said "get real", but had only attempted to explain the "real situation" concerning the filing of motions for new trials, because the law clerk was apparently incompetent. He argued she had demonstrated her incompetence during the trial when she failed to research an issue properly. He claimed, moreover, that he never made the last statement quoted. However, if the clerk had heard such a statement, he explained it would have been a comment to his secretary as he was hanging up the telephone. He emphatically denied that he ever made such a statement directed to the law clerk.

Of the seven DRB members who considered this matter, six agreed that all of these incidents constituted ethical misconduct supported by clear and convincing evidence. By a vote of four-to-two, four members of the DRB voted for a public reprimand, and two voted for suspension. A seventh member concluded that only respondent's actions toward the trial judge's law clerk constituted misconduct supported by clear and convincing evidence, for which he recommended a public reprimand. Nevertheless, this member expressed the view that had

he agreed with the DRB majority on the other incidents of misconduct, he would have recommended a term of suspension.

## II.

■ Based on our independent review of the record, we concur in the determination of the majority of the DRB in finding by clear and convincing evidence that respondent was guilty of violating *RPC* 3.2 and 8.4(d) in the *Dauphin* matter concerning each of the incidents of alleged misconduct. The evidence amply demonstrates that respondent engaged in a course of harassment and intimidation directed against persons engaged in adversarial positions in the course of an actively-litigated case in the Superior Court. Respondent challenged opposing counsel to a fight on several occasions; he also challenged a witness, the defendants' investigator, to a fight. He used loud, abusive, and profane language against his adversary and opposing witness. On at least one occasion, his language included racial innuendo. This conduct was pervasive and recurrent, continuing from the time of the trial call until after the filing of a motion for a new trial. It indisputably was, or had the clear capacity to be, disruptive, distracting, and unsettling to persons having significant responsibilities and important roles in the handling of the litigation.

■■ This conduct violates *RPC* 3.2 and 8.4(d). Respondent's conduct is intolerable because it has an effect that tends to undermine the proper administration of justice. Conduct calculated to intimidate and distract those who, though in an adversarial position, have independent responsibilities and important roles in the effective administration of justice cannot be countenanced. The adversary system depends on the effectiveness of adversary counsel. Our rules of procedure are designed in large measure to bring to litigation adversaries who have an equal opportunity and comparable ability in the representation of opposing parties in order to assure a just result. Thus, the undue and extraneous oppression and harassment of

participants involved in litigation can impair their effectiveness, not only as advocates for their clients, but also as officers of the court. An attorney who consciously and intentionally engages in such conduct perverts advocacy. Such conduct redounds only to the detriment of the proper administration of justice, which depends vitally on the reasonable balance between adversaries and on opposing counsels' respect, trust, and knowledge of the adversary system. There cannot be genuine respect of the adversary system without respect for the adversary, and disrespect for the adversary system bespeaks disrespect for the court and the proper administration of justice.

■ These considerations have importuned us to stress repeatedly that attorneys are required to act with common courtesy and civility at all times in their dealings with those concerned with the legal process. *In re McAlevy*, 69 *N.J.* 349 (1976); *In re Mezzacca*, 67 *N.J.* 387, 389–90 (1975). Should an attorney fail to abide by these requirements, discipline should be imposed.

■■ The DRB, however, determined to recommend only a public reprimand. It apparently believed that respondent's conduct could have been much worse, and, because it was not, it could be regarded with greater tolerance. It noted that respondent never vilified or attempted to intimidate the court, distinguishing this case from cases involving vilification and harassment directed toward a tribunal. *See, e.g., Matter of Stanley*, 102 *N.J.* 244, 253 (1986); *In re Mezzacca, supra*, 67 *N.J.* 388–89. Although the respondent did not direct his vituperative comments toward the trial judge, he did harass the judge's law secretary. This is itself, however, not a redeeming circumstance that mitigates respondent's offenses to others. "Vilification, intimidation, abuse and threats have no place in the legal arsenal." *In re Mezzacca, supra*, 67 *N.J.* at 389–90. "An attorney who exhibits the lack of civility, good manners and common courtesy here displayed tarnishes the

entire image of what the bar stands for." *In re McAlevy, supra*, 69 *N.J.* at 392.

Ironically, this point was emphasized in the very case in which the respondent was previously disciplined:

> In addition to respondent's outrageous in-court conduct and equally outrageous written applications and communications, respondent, on numerous occasions, also engaged in reprehensible behavior towards witnesses, potential witnesses, opposing counsel, and other attorneys outside the courtroom but inside the Courthouse.
>
>     \*      \*      \*      \*      \*      \*      \*      \*
>
> The Committee concluded that these actions of the respondent were designed to ridicule, embarrass and harass the individuals concerned, and in the case of his adversaries, his conduct was designed to intimidate them in the performance of their duties. The Committee therefore found that respondent had violated DR 1–102(A)(5) and (6). [*In re Vincenti*, supra, 92 *N.J.* at 597–98.]

In addition, we cannot overemphasize that some of the respondent's offensive verbal attacks carried invidious racial connotations. Such verbal abuse, we reiterate, was directed against another lawyer in the context of the practice of law. We believe that this kind of harassment is particularly intolerable. Any kind of conduct or verbal oppression or intimidation that projects offensive and invidious discriminatory distinctions, be it based on race or color, as in this case, or, in other contexts, on gender, or ethnic or national background or handicap, is especially offensive. In the context of either the practice of law or the administration of justice, prejudice both to the standing of this profession and the administration of justice will be virtually conclusive if intimidation, abuse, harassment, or threats focus or dwell on invidious discriminatory distinctions. *See, e.g., Gonzalez v. Comm'n on Judic. Perform.*, 33 *Cal.*3d 359, 657 *P.*2d 372, 188 *Cal.Rptr.* 880 (1983) (facially blatant ethnic slurs by judges constituted "unjudicial conduct" and "conduct prejudicial to the administration of justice"); *In re Stevens*, 31 *Cal.*3d 403, 645 *P.*2d 99, 183 *Cal.Rptr.* 48 (1982) (repeated use by judge of racial and ethnic epithets warrants public censure, even if judge otherwise performed judicial duties fairly and equitably and free from actual bias);

and *In re Williams,* 414 *N.W.*2d 394 (Minn.1987) (attorney's use of racial slur to opposing counsel violates Minnesota Code of Professional Responsibility).

In addition, the DRB acknowledges that the record does not support a finding that respondent was provoked. Nevertheless, it notes references to respondent "being touched by his adversary" and to "derogatory comments regarding respondent's prior suspension." This hardly justifies or mitigates respondent's conduct. We conclude, as did the DRB, that respondent was not goaded or provoked by anyone to engage in a course of obloquy and vituperation. Moreover, we are totally unimpressed by respondent's claim that he was not "serious" when he challenged his adversary to a fight or used opprobrious language. This did not blunt the impact or capacity of these actions for harm. *See, e.g., Matter of Mintz,* 101 *N.J.* 527, 535 (1986); *Matter of Milita,* 99 *N.J.* 336, 342 (1985).

The DRB apparently also gave "some credence to respondent's claim that he has sought to alter his behavior since his restoration to the practice of law in July 1984" and that "he has been in analysis, psychological and otherwise, for a period of time," noting, in addition that "[s]ince his restoration respondent has not had any other disciplinary infractions sustained against him." We have been presented with no documentation evidencing any serious commitment by respondent in dealing with any alleged emotional or psychological problems that may contribute to a proclivity toward this kind of behavior. We do not find under the circumstances that his conduct in this matter is mitigated by the actual or asserted claim of self-help.

The DRB, influenced by the belief that respondent's conduct could have been worse, and that he had apparently engaged in counselling, accordingly concluded that respondent's infractions warrant only a public reprimand, citing *In re Mezzacca, supra,* 67 *N.J.* at 387 (public reprimand for vilification and abuse of departmental review committee); *Matter of Stanley, supra,* 102 *N.J.* at 244 (public reprimand for engaging in undignified

and discourteous conduct at judicial hearing); and *In re Yengo*, 92 *N.J.* 9 (1983) (public reprimand for persistent abuse of the judicial process sufficient in light of mitigating factors of attorney's age, his failing health, his wife's precarious health, and his actual reduction of and imminent withdrawal from the practice of law). We are unpersuaded by the factors proffered by way of mitigation and disagree with the weight accorded to them by the DRB.

Respondent's prior disciplinary history is an aggravating factor. He clearly should have known that such an attitude and conduct as manifested in this case were totally unacceptable, inasmuch as similar behavior on his part had resulted in disciplinary charges and a prior suspension from the practice of law. *In re Vincenti, supra,* 92 *N.J.* 591. This Court explained emphatically to this respondent in its decision that an attorney in this state is subject to certain requirements:

[L]awyers [must] display a courteous and respectful attitude not only towards the court but towards opposing counsel, parties in the case, witnesses, court officers, clerks—in short, towards everyone and anyone who has anything to do with the legal process. Bullying and insults are no part of a lawyer's arsenal. [*Id.* at 603.]

We do not find in this case any difference in principle from that explained in the prior disciplinary case involving respondent. We there observed:

Under some circumstances it might be difficult to determine precisely the point at which forceful, aggressive trial advocacy crosses the line into the forbidden territory of an ethical violation. But no matter where in the spectrum of courtroom behavior we would draw that line, no matter how indulgent our view of acceptable professional conduct might be, it is inconceivable that the instances of respondent's demeanor that we are called upon to review in these proceedings could ever be countenanced. The record lays bare a shameful display of atrocious deportment calling for substantial discipline. [*Id.* at 592.]

The respondent has once again failed to meet this plain responsibility. Respondent's previously-imposed discipline should be treated as an aggravating circumstance, and thus discipline more severe than a public reprimand is warranted.

Accordingly, we determine that respondent shall be suspended for a period of three months and until further order of the Court. Respondent shall reimburse the Ethics Financial Committee for administrative costs, including the costs of producing transcripts.

So ordered.

*For suspension*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

## ORDER

This matter having been presented to the Court on the recommendation of the Disciplinary Review Board that LESTER T. VINCENTI of ELIZABETH, who was admitted to the bar of this State in 1971, be publicly disciplined, and good cause appearing;

It is ORDERED that LESTER T. VINCENTI of ELIZABETH be suspended from the practice of law for a period of three months, effective April 3, 1989, and until further order of this Court; and it is further

ORDERED that LESTER T. VINCENTI reimburse the Ethics Financial Committee for administrative costs, including the costs of reproduction of transcripts; and it is further

ORDERED that LESTER T. VINCENTI be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that LESTER T. VINCENTI comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with suspended attorneys.